George O. **LETHERT**, District Director of
Internal Revenue, Appellant,

v.

**CULBERTSON'S CAFE, INC.**, Appellee.

No. 16978.

United States Court of Appeals
Eighth Circuit.

Jan. 29, 1963.

John Piper, Atty., Tax Division, Dept. of Justice, Washington, D. C., for appellant. Louis F. Oberdorfer, Asst. Atty. Gen., Washington, D. C., Lee A. Jackson, Daniel K. Mayers, Crombie J. D. Garrett, Attys., Dept. of Justice, Washington, D. C., and Miles W. Lord, U. S. Atty., Minneapolis, Minn., and Murray L. Galinson, Asst. U. S. Atty., Minneapolis, Minn., were on the brief.

Donald F. Pratt, Minneapolis, Minn., for appellee and Dwain M. Ewing, Minneapolis, Minn., was with him on the brief.

Before SANBORN, BLACKMUN and RIDGE, Circuit Judges.

BLACKMUN, Circuit Judge.

Culbertson's Cafe, Inc., by this action, seeks recovery of additional federal cabaret excise taxes assessed against it and paid for the calendar quarter ended June 30, 1956. The case presents the narrow and perhaps first impression issue whether the tax reaches payments made during cabaret status for items and service supplied by the establishment before it attained that status. The taxpayer prevailed in the district court. Although the amount of additional tax, exclusive of interest, now in controversy for the quarter is approximately $4,400, the parties advise us, and the record discloses, that the disposition of this case will govern other calendar quarters and that the tax amount ultimately involved is substantial.

The applicable statutes are §§ 4231 and 4232 of the Internal Revenue Code of 1954. The portions of those sections

which are pertinent here are set forth in the margin.[1]

The essential facts are not in controversy. Many of them are stipulated. They disclose, for the calendar quarter here involved, the following:

1. The taxpayer is a corporation which since 1946 has operated a restaurant, bar, and package liquor store in St. Louis Park, Minnesota. Its premises included several public areas consisting of a main dining room, two private dining rooms, the package store, a front lounge, a front bar, and another lounge. As the case comes to us, only the taxability of certain sales made in the main dining room is in issue.

2. At one end of the dining room was a small dance floor with an area of about 250 square feet. During the earlier evening hours this space was occupied by tables for the accommodation of dining patrons.

3. The taxpayer operated its business from noon to one a. m. each day of the week except Sunday. We are concerned only with the night schedule of the dining room:

(a) Dinner service began between 5 and 6 p. m.

(b) From 7 to 9 p. m. organ music was presented.

(c) From 9 p. m. on a musical trio consisting of the organ, a guitar and a clarinet were presented. Only dinner music was played until dancing began.

(d) The time the space became available for dancing varied from 9 p. m. to 11:30 p. m. This depended upon when the tables placed in the space were no longer needed for dining guests.

(e) Dancing took place only after the space was cleared. It was then confined to that space. It continued to one a. m. There was never any dancing before 9 p. m.

4. The dancing facility was offered only as an incident to the taxpayer's restaurant business and to induce patrons to remain after the dinner period and to purchase food and refreshments.

5. The taxpayer made no admission, cover, minimum, or other direct or indirect charge for the privilege of dancing. Customers were not required to buy food or beverage as a condition for participating in the dancing. Prices were not increased because of the dancing. The taxpayer afforded no entertainment for its dining room patrons other than the music and the dancing facility which has been described.

6. The taxpayer collected, reported, and paid the federal cabaret tax imposed on amounts charged dining room patrons for items ordered and served during the dancing period.

---

1. "§ 4231. There is hereby imposed:

\* \* \* \* \*

"(6) Cabarets.—A tax equivalent to 20 percent [10% since May 1, 1960] of all amounts paid for admission, refreshment, service, or merchandise, at any roof garden, cabaret, or other similar place furnishing a public performance for profit, by or for any patron or guest who is entitled to be present during any portion of such performance. The tax imposed under this paragraph shall be returned and paid by the person receiving such payments. \* \* \* \*"

"§ 4232. (a) Admission.—The term 'admission' as used in this chapter includes seats and tables, reserved or otherwise, and other similar accommodations, and the charges made therefor.

"(b) Roof garden, cabaret or other similar place.—The term 'roof garden, cabaret, or other similar place,' as used in this chapter, shall include any room in any hotel, restaurant, hall, or other public place where music and dancing privileges or any other entertainment, except instrumental or mechanical music alone, are afforded the patrons in connection with the serving or selling of food, refreshment, or merchandise. \* \* \*

"(c) Performance for profit.—A performance shall be regarded as being furnished for profit for purposes of section 4231(6) even though the charge made for admission, refreshment, service, or merchandise is not increased by reason of the furnishing of such performance."

7. The taxpayer did not collect, report, or pay any cabaret tax on amounts charged for items ordered and served before the dancing period to dining room patrons who remained for any portion of that period and paid their checks after dancing began.[2]

The district court, in rendering its decision for the taxpayer, drew, as its line of demarcation between the charges subject to the cabaret tax and those not so subject, the commencement of the dancing period and ordering and delivery thereafter. Items ordered and delivered before but paid for afterward, even though dancing had then begun, were held not to have incurred the tax.

The cabaret tax at issue on this appeal, therefore, is only that tax assessed with respect to this latter type of transaction. A tax was assessed and paid with respect to items where the ordering, delivery and payment all took place after dancing began; the taxpayer does not assert that these were exempt. Similarly, no tax was assessed and paid with respect to items where the ordering, delivery and payment all took place before dancing began; the District Director does not here assert that these were taxable. We are concerned, we repeat, only with the tax alleged to have been incurred with respect to payments made after the dancing started for items served beforehand.

We, and the parties, recognize at the outset that the taxpayer's dining room did not possess cabaret status, within the meaning of §§ 4231(6) and 4232(b), at all times during its business day. The District Director concedes in his brief that the time from 7 to 9 p. m., when only organ music was offered, and the time from 9 p. m., when the trio appeared, up to the time dancing began, were periods in which the entertainment was of a type which did. not, under the statute, give rise to the imposition of the tax. That entertainment was "instrumental * * * music alone", within the exception present in § 4232(b), and cabaret status had not yet been acquired by the taxpayer.

The District Director argues at this point, however, that § 4231(6) is unequivocal in its language and that it imposes the tax upon "*all* amounts paid for * * * refreshment * * * at any * * * cabaret * * * by * * * any patron * * * *who is entitled to be present* * * *" (emphasis added); that payment, whenever made, which qualifies one to be present during the entertainment is the conclusive factor; that this is accomplished when the patron meets the conditions imposed by the management; that the statute does not carve out and exempt payments which happen to be for prior ordered and served items; that the statute contemplates the inclusion of some pre-performance sales; that in this case when a patron merely stayed on after the dancing began, he was entitled to be present; and that if Congress had intended to tax only those payments for items ordered and served during the performance the language of the statute would have been more direct, e. g., "all sales contracted during the entertainment period".[3] He asserts that the district court's holding is contrary to the clear mandate of the statute and "represents a long stride toward the effective judicial abolition of the cabaret tax".

It appears to us initially that the statute is ambiguous and has three possible interpretations: (1) One could conclude

2. The contested assessment also related to a percentage of the sales in the front lounge and front bar. The present appeal by the District Director, however, does not concern or extend to these lounge and bar sales. The district court's decision favorable to the taxpayer with respect to them has thus become final.

3. Of course one could argue oppositely by saying that if Congress had intended to tax all payments made during cabaret status even though they were for items ordered and served beforehand, the language would have been more direct, e.g., "all amounts paid at any cabaret for refreshment":

that if a payment is made by a patron entitled to be present during the performance, the payment is taxable whether it is made before, during or after cabaret status. (2) One could conclude that a payment is taxable if it is made while cabaret status is in effect and irrespective of whether the items paid for are ordered and served beforehand, during or afterward. (3) One could conclude that a payment is taxable whenever made if it is for items which are ordered and served during cabaret status. The first of these alternatives emphasizes entitlement and may be fairly said, we think, to be the historical position of the Internal Revenue Service. The second, which perhaps has found little favor in the decided cases, emphasizes the time of payment. The third, urged by the taxpayer here, emphasizes the time of ordering and serving. The Director's position in this particular case is narrow in import because we are now concerned only with payments made after dancing began.

There is much to be said for the position taken by the District Director. § 4231(6) on first reading may be said to emphasize amounts paid by a patron who is entitled to be present during any portion of the performance. Then, too, the standard which the taxpayer prefers, namely, the time of ordering and serving, seems to necessitate an accounting allocation between taxable charges and non-taxable charges for the patron who stayed on and who ordered and was served both before and after the assumption of cabaret status. There is something to be said also in favor of the argument that the time of payment should alone control. This standard would possess the happy capacity of providing a readily ascertainable event and thus a convenient and workable point for tax impact.

With any one of these alternatives the possibility of abuse and connivance between patron and proprietor may exist. In the present case there is no suggestion of this whatsoever.

■ With these various and conflicting approaches available, we look initially to the statutory history of the sections presently before us. Harrison v. Northern Trust Co., 1943, 317 U.S. 476, 479, 63 S.Ct. 361, 87 L.Ed. 407.

*The statutory history.* Admission taxes, of which the cabaret excise has always been a part, first appeared in the federal tax structure as § 700 of the Revenue Act of 1917. The taxes then imposed included one measured by the amount paid specifically for any admission, § 700(a), and, as well, one measured by the amount "paid for admission to any public performance for profit at any cabaret or other similar entertainment to which the charge for admission is wholly or in part included in the price paid for refreshment, service, or merchandise", § 700(c). It was described as a tax "imposed upon the general field of entertainment". Geer v. Birmingham, N.D.Ia., 1950, 88 F.Supp. 189, 197, reversed on other grounds, 8 Cir., 185 F.2d 82, cert. den. 340 U.S. 951, 71 S.Ct. 571, 95 L.Ed. 686. The 10% rate [4] imposed was increased to 15% by § 800(a) (6) of the Revenue Act of 1918. The same section of the 1918 Act added a provision reading, "the amount paid for such admission to be deemed to be 20 per centum of the amount paid for refreshment, service, and merchandise". This placed in the statute an administrative determination theretofore made by T.D. 2603 (issued December 4, 1917, but not published) as authorized by the 1917 Act. House Report No. 767, 65th Cong., 2d Sess., 1939–1 C.B. (Part 2) 86, 109. The statute then remained in essentially this form (although changed in other minor particulars not pertinent here) through

4. In these early statutes, through the First Revenue Act of 1940, the rate was expressed by cents rather than percentages. With perhaps some imprecision but for purposes of simplicity of expression, we employ the latter term.

succeeding acts until 1941.[5] The rate, however, was increased to 20% by § 210 of the First Revenue Act of 1940.

The first treasury regulations concerning the admissions tax were Regulations 43, adopted in 1918. They, as did the 1917 and 1918 Acts and the other cited statutes through 1940, emphasized the application of the cabaret tax to a charge for an admission and pointed out that the 20% allocation and the cabaret tax as such applied when any direct admission charge was inadequate to cover the cost of the entertainment provided or when the admission fee was adequate but the charge for refreshment was higher than at other times. These regulatory provisions remained substantially unchanged, so far as our present problem is concerned, through 1940.

The presence of a minimum or specific admission charge at some cabarets occasioned the difficult administrative problem of determining what portion of an establishment's total charges was subject to tax and whether it was the direct admissions tax or the cabaret tax which then applied. See S.T. 726, XIII–1 C.B. 431 (1934); S.T. 799, XIV–1 C.B. 420 (1935). The difficulty was noted in House Report No. 1040, 77th Cong., 1st Sess., 1941–2 C.B. 413, 438. This led to a change in the statute effected by § 542 of the Revenue Act of 1941. § 1700(e) (1) of the 1939 Code was thereby amended to provide for a tax of 5% of all charges "paid for admission, refreshment, service, and merchandise, at any roof garden, carbaret (sic) * * *, if any payment, or part thereof, for admission, refreshment, service, or merchandise, entitles the patron to be present during any portion of such performance". It further provided that the direct admissions tax was not applicable to an amount subjected to the cabaret tax. All this replaced the old reference to "admission to any public performance * * at any * * * cabaret * * * " and the old allocation of 20% of the cabaret charge to admission. We note the presence for the first time of words directed to a right to be there, namely, "entitles the patron to be present". This very expression, although the requirement that the admission charge be identified or assumed was abandoned, retains the statutory emphasis upon admission. And we have the incidence of the tax directed to admission to a cabaret and the like rather than to admission to a public performance there.

Through the 1941 Act, however, the successive statutes did not state precisely what was contemplated by the admission concept or define the terms "public performance for profit" and "roof garden, cabaret, or other similar entertainment [place]". As a consequence, litigation ensued. Early decisions were adverse to the government. The courts concluded either that no admission charge was being made directly or imbedded among other charges or that the establishment did not satisfy the quoted phrases. Comments appeared, too, to the effect that the pertinent portion of the statute was clear and unambiguous and tolerated no administrative interpretation. United States v. Broadmoor Hotel Co., D.Colo., 1929, 30 F.2d 440; Deshler Hotel Co. v. Busey, S.D.Ohio, 1941, 36 F.Supp. 392, affirmed, 6 Cir., 130 F.2d 187, 142 A.L.R. 563, with one judge dissenting; Schuster's Wholesale Produce Co. v. United States, W.D.La., 1943, 49 F.Supp. 909; Rogers v. Stuart, D.Ariz., 1945, 80 F. Supp. 436; Sir Francis Drake Hotel Co. v. United States, N.D.Cal., 1947, 75 F. Supp. 668. These decisional results were reached in the face of seemingly contrary provisions in the applicable regulations.

The Revenue Act of 1942, § 622, then further amended § 1700(e) (1) of the 1939 Code. This effected three changes. It defined a performance for profit to include one "even though the charge made for admission, refreshment, service, or

---

5. Revenue Act of 1921, § 800(a) (5); Revenue Act of 1924, § 500(a) (5); Revenue Act of 1926, § 500(a) (5); Internal Revenue Code of 1939, § 1700 (e) (1).

merchandise is not increased by reason of the furnishing of such performance." It defined the term "roof garden, cabaret, or other similar place" to include a room in a restaurant "where music and dancing privileges or any other entertainment, except instrumental or mechanical music alone, are afforded the patrons in connection with the serving or selling of food, refreshment, or merchandise." And it replaced the 1941 phrase "if any payment, or part thereof, for admission, refreshment, service, or merchandise, entitles the patron to be present during any portion of such performance" with "by or for any patron or guest who is entitled to be present during any portion of such performance." Theretofore existing administrative attitude was in large part thus carried over into the statute and some of the court decisions adverse to the government were countered by this statutory amendment. It became clear, for example, that the Congress now intended the tax to apply even though there was no increase in charges made by reason of the performance. Senate Report No. 1631, 77th Cong., 2d Sess., 1942–2 C.B. 504, 700; House Report (Conference) No. 2586, 77th Cong., 2d Sess., 1942–2 C.B. 701, 732.

Entitlement to be present was a factor still retained but it was general entitlement and was not tied in, as before, to a payment which created the right to be present. If the patron had the right to be present that was now enough for the tax to apply to appropriate payments made by him. In other words, the right to be present was essential and the tax followed upon the payment; under the 1941 Act it had been necessary that the payment create the right before the tax attached. Again the Regulations were revised. T.D. 5192, 1942–2 C.B. 249. See Mim. 5699, 1944 C.B. 647.

These changes were recognized by the courts. The statute was now sometimes described as ambiguous, the administrative interpretation was given effect, and the tax was upheld where it had been rejected before upon similar facts. Rogers v. Stuart, supra, p. 437 of 80 F.Supp.;

Baldwinson v. United States, W.D.Wash., 1948, 80 F.Supp. 687. See Avalon Amusement Corp. v. United States, W.D. Wis., 1947, 73 F.Supp. 328, affirmed, 7 Cir., 165 F.2d 653, and Schuster's Wholesale Produce Co. v. United States, supra, p. 911 of 49 F.Supp.

The Avalon case and our own decision in Birmingham v. Geer, 8 Cir., 1950, 185 F.2d 82, cert. den. 340 U.S. 951, 71 S.Ct. 571, 95 L.Ed. 686, reversing Geer v. Birmingham, supra, 88 F.Supp. 189, concerned situations where the service claimed to be taxable was seemingly only incidental to the main operation of a public ball room. The controversial aspect of Avalon's tax related only to checkroom service. Geer concerned amounts paid by patrons for soft drinks, gum, candy, cigarettes, and checkroom service. Both opinions reached the conclusion that the operation, because of these services, was a "cabaret, or other similar place" within the statute, as amended by the 1942 Act, and that payments for these additional services, although incidental, were subject to the tax.

This result was promptly changed by § 404(a) of the Revenue Act of 1951 when the term "cabaret" was specifically denied application to a ball room or similar place where the selling of refreshments was merely incidental. That this change was prompted by the Avalon and Geer appellate decisions is apparent from House Report No. 586, 82d Cong., 1st Sess., 1951–2 C.B. 357, 396, 448, and Senate Report No. 781, 82d Cong., 1st Sess., 1951–2 C.B. 458, 538, 593, U.S.Code Congressional and Administrative News 1951, pp. 1781, 1969. This and other courts of course recognized this statutory change. See Godwin v. Brown, 8 Cir., 1957, 249 F.2d 356, 358–359; Peony Park, Inc. v. O'Malley, 8 Cir., 1955, 223 F.2d 668, cert. den. 350 U.S. 845, 76 S.Ct. 87, 100 L.Ed. 753; Landau v. Riddell, 9 Cir., 1958, 255 F.2d 252; Billen v. United States, 10 Cir., 1960, 273 F.2d 667; Stevens v. United States, 5 Cir., 1962, 302 F.2d 158. See also Rev.Rul. 57–404, 1957–2 C.B. 738. The language of § 1700(e) (1) of the 1939 Code as thus

amended was carried over into the 1954 Code as §§ 4231(6) and 4232(b) and (c).

Simple changes in the applicable cabaret tax rates were also effected from time to time during this period. The rates were increased by the Revenue Act of 1943, § 302(a), from 5% to 30%; were then reduced to 20% by the Act of June 9, 1944, 58 Stat. 272; and finally were reduced to 10% in 1960 by Pub.L. 86–422, § 1, 74 Stat. 41.

The foregoing sets forth all that we have been able to find which is of possible pertinence in the legislative history as affected and promoted by contemporaneously decided cases and administrative interpretations. Although one may perhaps draw contrary arguments from this material, we think this historical review does reveal the following: (1) The cabaret tax is and always has been bottomed on the admission concept. Until the 1941 Act the statute went so far as to specify or provide for the determination of what percent of the total was to be regarded as the admission charge. Although in its present form it is measured, with certain stated exceptions, by all amounts paid not only for admission but for refreshment, service or merchandise as well, this feature has developed from the peculiar and broad nature of a cabaret operation which possesses aspects beyond that of a formal admission. This conclusion is fortified by the location of the cabaret tax provisions in that part of each statute, including the 1954 Code, having to do with admissions. (2) Congress has not intended that every function which might possibly be regarded as a cabaret operation should be subjected to the tax. The exemption of the presentation of instrumental or mechanical music alone, since the 1942 Act; of incidental services, since the 1951 Act; and of performances outside the United States, since an amendment effective January 1, 1959, are all indicative of this. Congress therefore knows how to provide exemptions when it feels they are needed. (3) Congress has not always moved only in the direction of expansion of the tax base. The 1951 statutory change as to

incidental services discloses that it does not hesitate to limit the effect of court decisions which it felt were overly broad and liberal.

■■ All this sheds light but does not finally resolve for us the question of taxability of prior ordered and served items paid for after cabaret status is acquired. This is the problem that, as we have noted, becomes acute for the taxpayer which admittedly does not operate as a cabaret throughout its entire business day. We therefore look to more recent cases which the parties respectively assert have pertinent application for the disposition of this one.

*The cases.* No case precisely in point has been found. Others come close. The six important ones, stressed by the parties and involving taxpayers whose status shifted between non-cabaret and cabaret during the evening, are, chronologically:

1. La Jolla Casa de Manana v. Riddell, S.D.Cal., 1952, 106 F.Supp. 132. This concerned 1947–49 taxes assessed with respect to refreshments ordered, served and paid for after cabaret status had admittedly ceased. The Commissioner had taken the position that one-third of these receipts were taxable because, he said, they were allocable to patrons who had been present during some portion of the performance and had stayed on. He thus related the tax to all payments made at any time by those who had been present. The decision, however, went the other way. Here the unity concept, relied upon by the taxpayer and the district court in the case before us, first appeared, the court saying, p. 135:

> "It is the clear import of the language of the statute that Congress did not intend to reach payments for refreshment served *after* the establishment ceased to be a 'cabaret'.
> \* \* \*
>
> "It is clear that Congress envisioned an essential unity between the service of refreshment and the enjoyment of the entertainment. The reason for this unity is the reason for the tax itself: that the payment

for the refreshment should operate to entitle the patron to view the entertainment, or participate in the dancing, as the case may be."

The Ninth Circuit affirmed on the basis of the trial court's opinion. 206 F.2d 925.

2. Hover v. United States, S.D.Cal., 1958, 158 F.Supp. 179. This concerned 1951–55 taxes. A night club's main room where entertainment was offered and its adjoining lounge were separated by a movable wall and curtain from another room rented for private parties. It was held that receipts for refreshments and services in the latter room prior to removal of the wall and curtain were not taxable but that receipts for refreshments ordered and served there after the removal, when the occupants could watch the floor show, were taxable. Essentially, therefore, this case concerned ordering, service and payment before cabaret status, as contrasted with La Jolla's concern with ordering, service and payment after cabaret status. The trial judge (now Circuit Judge Kaufman of the Second Circuit), pp. 182–184, while acknowledging that pre-cabaret receipts might not be free from tax in all situations, felt that the statute was ambiguous, was to be construed "so as not to produce illogical or irrational results", and was to be considered "in the light of each factual situation as it is presented". He raised a test of "motivation formulation" for application to private room parties, looked to see what the compelling motive was for the reservation of the room, and concluded that in that case privacy was the attraction, that assimilation into the cabaret atmosphere of the main room was of incidental significance, and that the tax did not attach to the prior payments.

The Ninth Circuit affirmed. 268 F.2d 657. That court noted, pp. 662 and 664, that the statute cannot be applied literally without creating administrative difficulties and that, as was said in La Jolla, "this tax is clearly to be applied when there is the combination of entertainment, and refreshments or food".

3. In re Alpine Village, Inc., 1958–2 U.S.Tax Cases, Par. 15182, 2 AFTR 2d 6485. This is a decision of a referee in bankruptcy for the Northern District of Ohio. It concerned 1953–54 taxes. Here the questioned payments were made prior to cabaret status. The referee stressed the essential unity approach, concluded that there was no unity between the prior service and the entertainment, acknowledged that, as was intimated in the Hover trial court opinion, not all prepayments are entirely ruled out from tax, and said:

"In both La Jolla and Hover, it is quite plain that absent some palpable evidence of fraudulent evasion—the consumption of food or refreshment to be taxable must be contemporaneous with the entertainment—*during* the entertainment. * * *

"The La Jolla and Hover cases * * * hold that the only practical and reasonable construction limits the tax to the amount paid for food and refreshment consumed *during* the entertainment."

4. Rokicki v. United States, N.D. Ohio, 1958, 164 F.Supp. 610. This concerned 1953 tax. This taxpayer, operating a restaurant-bar, concededly was on a cabaret status from 9:15 p. m. to closing. Its business day, however, began at 3:30 p. m. From then to 7:30, no admission or cover charge was imposed. At the end of that period such a charge went into effect. The controversy centered on sales between 7:30 and 9:00 p. m. It did not concern pre-7:30 p. m. sales, even though some of those patrons remained after that time. The court held that all post-7:30 p. m. sales were taxable to the extent the paying patron remained for the entertainment. The District Director claims that this holding is in point for the case before us. Its authority, however, is clouded by the fact of the imposition of the admission or cover charge at 7:30 p. m. and the probable acquisition of cabaret status at that time. The Ninth Circuit in Bush, infra, p. 784 of 277 F.2d, this Circuit in Eddy Bros., infra, p. 531 of 291 F.2d,

and the trial court in Eddy Bros., infra, p. 452 of 184 F.Supp., all describe the case as factually distinguishable.

5. Bush's Inc. v. United States, E.D. Ill., 1959, 171 F.Supp. 681. This concerned 1951–57 taxes. The taxpayer operated an East St. Louis bar which, from opening until midnight, presented entertainment limited to instrumental music. From midnight to 3 a. m. a singer joined the instrumentalists. The singer went off duty at 3 a. m. and thereafter until closing only instrumental music was presented. On Saturday nights the establishment also operated another bar where there was dancing from midnight to 3 a. m. Taxability in each bar during the three hours following midnight was not in dispute. The controversy concerned the establishment's sales and service prior to midnight and after 3 a. m. A tax was assessed on one-third of the pre-midnight sales and on one-half of the post-3 a. m. sales on the theory that these were the percentages allocable to patrons who remained for the performance or who had been present for it and stayed on.

The district court stated that it was in wholehearted agreement with the reasoning in La Jolla and concluded that from 3 a. m. on the establishment was no longer a cabaret and that purchases made by patrons after that time did not incur tax. The court went on to say, p. 685, with respect to pre-midnight items, that all payments made during the entertainment period were taxable whether they were for items ordered and served during that period or prior thereto. This statement by the district court therefore supports the Director's position in the case before us.

On Appeal, the Seventh Circuit affirmed. 277 F.2d 780. From this opinion, however, it is clear to us that the Seventh Circuit approved the non-taxability of items ordered, served and paid for after the entertainment period and the non-taxability of items ordered, served and paid for before the entertainment period; that payments made during the entertainment period for items ordered and

served before were not at issue; and that the trial court's comments with respect to payments of that kind were therefore dictum.

6. Eddy Bros. v. United States, W.D. Mo., 1960, 184 F.Supp. 450. This concerned 1950–54 taxes. The taxpayer's dining room and cocktail lounge were open from 11:30 a. m. to 1:30 a. m. Entertainment was afforded from 8:30 p. m. to 1 a. m. The patron who paid his bill before 8:30 p. m. for items already served was not charged any tax even though he stayed on. He was taxed with respect to an entertainment charge imposed at that time and also on items served thereafter. The tax in controversy was directed to items ordered, served and paid for before 8:30 p. m. by patrons who remained for the entertainment. This issue was decided in favor of the taxpayer. The court said, p. 452:

> "In all the cases, the ground relied on was that Congress envisioned an essential unity between service of refreshment and enjoyment of entertainment, and that it did not intend to reach payments for refreshments served when the establishment was not a cabaret."

This result was affirmed by this court in United States v. Eddy Bros., 1961, 291 F.2d 529. There we expressed agreement with the Seventh Circuit's interpretation of the statute in Bush and with the unity theory. Judge Van Oosterhout, in writing for this court, described the trial court's opinion as a well considered one and repeated the quotation we have just noted.

From this case review, we think it may properly be said in summary that:

1. The statute in its present form is clearly ambiguous.

2. The change of an establishment's status from non-cabaret to cabaret, or the reverse, has been a fact recognized in the decisions and has been given tax effect. La Jolla, Hover, Alpine Village, Rokicki, Bush, Eddy.

3. The courts generally have either directly recognized, or have not disavow-

ed, the concept of necessary unity between the thing or service paid for and the enjoyment of the performance. La Jolla, Hover, Alpine Village, Rokicki, Bush, Eddy. Carroll v. United States, E.D.Pa.1962, 213 F.Supp. 847.

4. The courts have not accepted the thesis advanced by the government on occasion that if the establishment qualifies as a cabaret at any time during an evening, all payments made by a patron present or entitled to be present during any portion of the performance are taxable, irrespective of when the service may have been effected. Thus tax has been denied (a) in situations of order, service and payment after the performance ceases, even with respect to patrons who had been present during the entertainment, La Jolla, Bush, Carroll, and Rokicki (dictum), and (b) in situations of order, service and payment before the performance with respect to patrons who had remained for the entertainment. Hover, Alpine Village, Rokicki (pre-7:30 p. m. sales), Bush, Eddy.

5. There is emphasis on the "combination of entertainment, and refreshments or food" in Hover (9 Cir.), Alpine Village, and Eddy, and in Senate Report No. 1084, 86th Cong., 2d Sess., 1960–1 C.B. 808, U.S.Code Congressional and Administrative News 1960, p. 1862, where, in respect to the 1960 rate change, it was said, "Moreover, the 20-percent rate applies only where there is a combination of entertainment and the serving of food or beverages". Compare, too, the language in House Report No. 481, 85th Cong., 2d Sess., 1958–3 C.B. 372, 408, and in Senate Report No. 2090, 85th Cong., 2d Sess., 1958–3 C.B. 584, 623, U.S. Code Congressional and Administrative News 1958, p. 4395, concerning the Excise Tax Technical Changes Act of 1958. It is to be noted that it is not said that the taxable combination is entertainment and payment.

The District Director's present position that a payment made during cabaret status is taxable, even though it is for items served prior to the acquisition of that status, does find some support in the dictum of the trial court in Bush, supra, p. 685 of 171 F.Supp.; possibly in the intimations in the district court opinion in Hover, and in the referee's opinion in Alpine Village, that there may be situations where pre-entertainment payments are taxable; in the uncontested instructions of the trial court in Godwin v. Brown, supra, pp. 361–62 of 249 F.2d; to a degree in Rokicki; and in the Service's own rulings, Rev.Rul. 54–487, 1954–2 C.B. 376, Rev.Rul. 59–372, 1959–2 C.B. 318, Rev.Rul. 61–61, 1961–1 C.B. 492 (where the Internal Revenue Service announced it would not follow Bush), and Mim. 5699, 1944 C.B. 647.

We find ourselves, however, in accord with what we feel are the fundamental holdings and implications of La Jolla, Alpine Village, Hover, Bush, and our own Eddy Bros. case, which relate the tax to items ordered and served during the period the establishment is on a cabaret status. We again conclude that Rokicki is distinguishable on its facts.

We therefore agree with the trial court that the payments in controversy here, although made during cabaret status, were not subject to the tax when they were in fact for items ordered and served before that status was assumed. We feel that the reach of §§ 4231(6) and 4232(b) is not to amounts paid at a cabaret but, rather, to amounts paid for items served or service rendered while an establishment has cabaret status. The time of payment in itself is thus not of any particular import. What is significant is the attainment of cabaret status and the supplying of items and rendition of service while that status is in effect. Payment itself can be in advance or it can be subsequent.

With this approach the solution of this case is readily apparent. This taxpayer must prevail in its quest for refund because the payments in issue are all attributable to items and service provided at a time prior to cabaret status.

We feel that this result is in line with the intent of Congress so far as that can be ascertained from the legislative his-

tory, that it accords with and does not do violence to the language of the governing statutes, that it is consistent with the decided cases and actually is the substance of their holdings, and that it presents a not unworkable and practical standard[6] for the incurrence of the tax. Here, as is not infrequently the situation in tax cases, the statutory language is not "crystal clear", congressional intent is not entirely apparent, and the situation is perhaps not wholly free of administrative problems or the possibility of abuse. However, any other solution will encounter like observations. We think the trial court reached the correct result.

Affirmed.

6. "Taxation is an intensely practical matter and laws in respect of it should be construed and applied with a view of avoiding, so far as possible, unjust and oppressive consequences." Farmers Loan & Trust Co. v. Minnesota, 1930, 280 U. S. 204, 212, 50 S.Ct. 98, 100, 74 L.Ed.

371; Tyler v. United States, 1930, 281 U.S. 497, 503, 50 S.Ct. 356, 74 L.Ed. 991; St. Louis Union Trust Co. v. Burnet, 8 Cir., 1932, 59 F.2d 922, 927; Helvering v. Cannon Valley Milling Co.. 8 Cir., 1942, 129 F.2d 642, 647.